# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GARY D. VOIGT, Individually and on Behalf of All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant NCI BUILDING SYSTEMS, INC.,

Plaintiff,

v.

JAMES S. METCALF, DONALD R. RILEY, NATHAN K. SLEEPER, WILLIAM R. VANARSDALE, JONATHAN L. ZREBIEC, KATHLEEN J. AFFELDT, JAMES G. BERGES, LAWRENCE J. KREMER, GEORGE MARTINEZ, GEORGE L. BALL, GARY L. FORBES, JOHN J. HOLLAND, CLAYTON, DUBILIER & RICE FUND VIII, L.P., and CLAYTON, DUBILIER & RICE, LLC,

Defendants,

and

NCI BUILDING SYSTEMS, INC., a Delaware corporation,

Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2018-0828-JTL

## MEMORANDUM OPINION

Date Submitted: November 12, 2019
Date Decided: February 10, 2020

Peter B. Andrews, Craig J. Springer, David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy S. Friedman, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; D. Seamus Kaskela, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Counsel for Plaintiff.*

Gregory P. Williams, Brock E. Czeschin, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rachelle Silverberg, Caitlin A. Donovan, Drew C. Harris, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendants James S. Metcalf, Donald R. Riley, Kathleen J. Affeldt, Lawrence J. Kremer, George Martinez, George L. Ball, Gary L. Forbes, and John J. Holland and Nominal Defendant NCI Building Systems, Inc.*

David J. Teklits, Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware; Shannon Rose Selden, Susan R. Gittes, Zachary H. Saltzman, DEBEVOISE & PLIMPTON LLP, New York, New York; *Counsel for Defendants Clayton, Dubilier & Rice, Fund VIII, L.P., Clayton, Dubilier & Rice, LLC, Nathan K. Sleeper, William R. VanArsdale, Jonathan L. Zrebiec, and James G. Berges.*

**LASTER, V.C.**

The plaintiff owns common stock in NCI Building Systems, Inc. (the "Company"), a publicly traded Delaware corporation. The plaintiff alleges that the private equity firm known as Clayton, Dubilier & Rice ("CD&R") controls the Company, citing indicia that include CD&R's control over 34.8% of its voting power, the presence of four CD&R insiders on the Company's twelve-member board of directors (the "Board"), relationships of varying significance with another four directors, and a stockholders agreement that gives CD&R contractual veto rights over a wide range of actions that the Board could otherwise take unilaterally.

In July 2018, the Company acquired Ply Gem Parent, LLC ("New Ply Gem"). The acquisition was structured as a direct merger of New Ply Gem with and into the Company. As a result of the merger, the equity interests in New Ply Gem were converted into sufficient shares to result in the Company's post-transaction equity being split equally between the former owners of the two pre-transaction entities. This merger is the transaction that the plaintiff challenges in this litigation (the "Challenged Transaction").

Just three months before the Challenged Transaction, CD&R created New Ply Gem by completing a leveraged buyout of its publicly traded predecessor, Ply Gem Holdings, Inc. ("Old Ply Gem"), then combining Old Ply Gem with a portfolio company owned by Golden Gate Capital (the "Precedent Transaction"). After the Precedent Transaction, CD&R owned 70% of New Ply Gem and had the right to appoint a majority of its directors.

In Counts I and II of the currently operative complaint, the plaintiff asserts that CD&R and the members of the Board breached their fiduciary duties in connection with the Challenged Transaction. The plaintiff maintains that because CD&R controlled both

1

the Company and New Ply Gem, the defendants must establish that the Challenged Transaction was entirely fair. According to the plaintiff, it is reasonably conceivable that the Challenged Transaction was not entirely fair, because when negotiating the deal, CD&R insisted on terms that valued the equity of New Ply Gem at nearly $1.236 billion. Yet just three months earlier, when completing the Precedent Transaction, CD&R and Golden Gate agreed that the value of New Ply Gem's equity was $638 million. As the plaintiff sees it, the Company paid CD&R and Golden Gate a 94% premium, amounting to a $600 million windfall, for their three-month investment. The plaintiff contends that the Challenged Transaction also benefitted CD&R because New Ply Gem was highly leveraged, and through the Challenged Transaction, the Company took on New Ply Gem's debt. In Count III of the complaint, the plaintiff contends that CD&R was unjustly enriched by the Challenged Transaction.

The defendants moved to dismiss the complaint for failing to state a claim on which relief can be granted. They maintain that the plaintiff has not plead facts sufficient to support a reasonable inference that CD&R controlled the Company. As a result, they contend that either the traditional business judgment rule applies or, under *Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2014), an irrebutable version of the business judgment rule governs. Either would result in dismissal. Seven of the individual defendants argue that even if the transaction is subject to review for entire fairness, they should be dismissed because they have been granted exculpation. Four argue that they should be dismissed because they abstained from voting on the Challenged Transaction. The

2

defendants further argue that Count III of the complaint fails to state a claim for unjust enrichment.

This decision largely denies the motions to dismiss. At the pleading stage, it is reasonably conceivable that CD&R controlled the Company, subjecting the Challenged Transaction to review under the entire fairness standard. The valuation gap between the Challenged Transaction and the Precedent Transaction is sufficiently large, and the temporal gap sufficiently short, to support a pleading-stage inference of unfairness. Counts I and II therefore state claims for breach of fiduciary duty.

Four of the seven individual defendants who rely on exculpation are entitled to dismissal. As to the other three, it is reasonably conceivable that they may have acted to serve CD&R's interests, giving rise to a non-exculpable claim. The four individual defendants who rely on abstention are not entitled to dismissal at this stage.

The motion to dismiss Count III is also denied. Although the claim for unjust enrichment is likely duplicative, the plaintiff is entitled to plead in the alternative.

## I. FACTUAL BACKGROUND

The facts are drawn from the currently operative complaint and, by agreement of the parties, documents that the plaintiff obtained using Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220. Citations in the form "Ex. — at — " refer to these documents, which the defendants attached as exhibits to their briefs. *See* Dkts. 48– 56, 69. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences, including inferences drawn from documents.

3

## A. CD&R Acquires Control Of The Company.

The Company manufactures metal products for the North American commercial building industry. During the Great Recession, the Company became financially distressed.

In October 2009, CD&R acquired control of the Company by causing Clayton, Dubilier & Rice Fund VIII, L.P. ("Fund VIII") to purchase 250,000 shares of a newly created series of convertible preferred stock. Among other rights, the shares carried 68.4% of the Company's voting power.[1]

As part of the October 2009 transaction, all but three of the incumbent members of the Board resigned. The three incumbent directors who remained were Norman C. Chambers, the Company's CEO, and Gary L. Forbes and George Martinez, both outside directors. As part of the transaction, the incumbent directors appointed to the Board three individuals designated by CD&R: Nathan K. Sleeper and James G. Berges, both CD&R partners, and Lawrence J. Kremer, an individual with longstanding ties to CD&R.

Later that month, the Board appointed two additional directors designated by CD&R: Jonathan Zrebiec, another CD&R partner, and Kathleen Affeldt, another individual with longstanding ties to CD&R. In an information statement dated October 30, 2009, the Company disclosed that with CD&R's five designees on the Board, "the CD&R

---

[1] Clayton, Dubilier & Rice LLC (the "CD&R Investment Advisor") acts as the investment advisor for Fund VIII. It is reasonable to infer at this stage that within the CD&R private equity complex, Fund VIII and the CD&R Investment Advisor are, at a minimum, affiliates and under the common control of CD&R's principals. For simplicity, this decision refers generally to CD&R.

Funds will have the ability, subject to the fiduciary duties of the individual directors, to control the decisions of the Board." Ex. 2 at 3. The Company thus regarded Affeldt and Kremer as directors who, subject to their fiduciary duties, were subject to CD&R's control. All five of the original CD&R designees continued to serve on the Board throughout the events giving rise to this litigation.

In connection with the October 2009 investment, CD&R and its affiliates entered into a stockholders agreement with the Company. *See* Ex. 4 ("Stockholders Agreement" or "SA"). The information statement described it as giving CD&R "substantial governance rights." Ex. 2 at 3.

Among other things, the Stockholders Agreement gave CD&R certain ongoing rights with respect to the composition of the Board:

- As long as CD&R held 10% or more of the Company's voting power, CD&R could designate a number of "Investor Directors" proportionate to its voting interest, rounded to the nearest whole number. SA § 3.1(b)(i).

- As long as CD&R held 20% or more of the Company's voting power, CD&R could designate one of the Investor Directors as either the Board's "Lead Director" or the Chairman of the Executive Committee. *Id.* § 3.1(b)(v).

- CD&R was entitled to representation on committees proportionate to its voting interest, including having at least one CD&R designee on each committee on the Board, except if CD&R or the designee would be in a conflict position on a special committee. *Id.* § 3.1(d).

The Stockholders Agreement also granted CD&R contractual consent rights over a wide range of significant corporate and finance matters, including decisions that the Board otherwise would be able to take without needing any stockholder-level approvals. The decisions included:

5

- Acquiring or diverting assets worth more than 10% of the Company's total asset value. *Id.* §§ 6.1(a)(i) & (ii).

- Granting stock options exceeding $5 million in a single year. *Id.* § 6.1(a)(iii).

- Redeeming more than $10 million in stock. *Id.* § 6.1(a)(iv).

- Declaring dividends. *Id.* § 6.1(a)(v).

- Guaranteeing debt exceeding $35 million. *Id.* § 6.1(a)(vi).

- Engaging in a material new business. *Id.* § 6.1(a)(vii).

- Adopting a plan of complete or partial liquidation. *Id.* § 6.1(a)(viii).

- Increasing the number of directors on the Board. *Id.* § 6.1(a)(ix).

- Amending the bylaws. *Id.* § 6.1(a)(x).

- Issuing additional stock. *Id.* § 6.1(b).

CD&R retains its veto over issuances of additional stock as long as it owns shares carrying 20% or more of the Company's voting power. *Id.* CD&R retains the other rights as long as it owns shares carrying 25% or more of the Company's voting power. *Id.* § 6.1(a).

The Stockholders Agreement also contained counterbalancing provisions. As long as stockholders unaffiliated with CD&R held at least 5% of the Company's outstanding voting power, then the Stockholders Agreement designated at least three seats on the Board for individuals who were not Investor Directors. One seat was reserved for the Company's CEO. The other two seats were reserved for "Unaffiliated Shareholder Directors." *See id.* § 3.1(c)(i). Without CD&R's consent, there could not be more than two Unaffiliated Shareholder Directors on the Board. *See id.*

The Unaffiliated Shareholder Directors had to be "Independent Directors," defined in simplified terms as an individual who would qualify as independent under the New York Stock Exchange rules without giving consideration to the individual's service on any board of a CD&R portfolio company. *See id.* at 8-9. They also had to be "Independent Non-Investor Directors," *i.e.* Independent Directors whom CD&R had not designated. *Id.* § 3.1(c)(i); *see id.* at 9. If CD&R designated any Independent Directors, then they were defined as "Investor Independent Directors." *See id.* at 9.

Initially, Forbes and Martinez were the Unaffiliated Shareholder Directors. The Stockholders Agreement called for the Unaffiliated Shareholder Directors to nominate their successors and fill any vacancies in their seats. *See id.* §§ 3.1(c)(ii) & (iii). In any election for Unaffiliated Shareholder Directors, CD&R committed to vote its shares for the Unaffiliated Shareholder Directors proportionately with the votes of the unaffiliated shares. *See id.* § 3.1(c)(iv). CD&R also committed that no Unaffiliated Shareholder Director would be removed except by the affirmative vote of unaffiliated shareholders holding 80% of the unaffiliated voting power. To implement this protection, CD&R committed to vote against removal unless holders of unaffiliated shares representing 80% of the unaffiliated voting power voted in favor of removal, in which case CD&R would vote its shares proportionately with the unaffiliated holders. *See id.* § 3.1(c)(v). In the Stockholders Agreement, the parties agreed that each committee of the Board would have at least one Unaffiliated Shareholder Director as a member. *See id.* § 3.1(d).

If CD&R's ownership stake fell below 50%, then CD&R undertook additional voting commitments:

7

- CD&R would cause its shares to be present in person or by proxy at all meetings of stockholders for purposes of establishing a quorum.

- CD&R would vote in favor of all candidates nominated by the Board.

- CD&R would vote as recommended by the Board on any proposals relating to compensation or equity incentives for directors, officers, or employees, subject to CD&R's ability to exercise its contractual consent rights as applicable.

- On any issue where CD&R had a contractual consent right, CD&R would vote its shares as recommended by the Board only if the recommendation was consistent with CD&R's exercise of its consent right. In other words, CD&R could vote its shares as it wished.

*See id.* § 3.2.

The Stockholders Agreement contained a standstill agreement limiting CD&R's ability to buy additional shares of the Company, but it expired in 2012. From that point on, the Stockholders Agreement did not impose any limitations on CD&R's ability to purchase shares. *See id.* § 3.3.

**B.     The Expanded Board**

After CD&R's investment, additional directors joined the Board. In November 2009, John J. Holland joined as an Independent Non-Investor Director. In February 2014, George Ball joined as an Independent Non-Investor Director. The five original CD&R appointees (Sleeper, Berges, Zrebiec, Affeldt, and Kremer) and the two original Unaffiliated Shareholder Directors (Forbes and Martinez) continued to serve.

In 2016, CD&R started reducing its holdings in the Company. By the end of 2016, its equity stake stood at 42%.

During 2017, there were additional changes in the Board. In April 2017, CD&R added William VanArsdale, an operating advisor who provides consulting services to

8

CD&R and its funds, as an Investor Director. In May 2017, James Metcalf joined as an Independent Non-Investor Director.

The seat on the Board reserved for the CEO passed to Donald Riley. The Company hired Riley as a senior executive in December 2014, while CD&R held an outright majority interest in the Company. In July 2017, the Board named Riley as CEO, appointed him to the Board, and made him a member of the Executive Committee.

In December 2017, CD&R again sold shares in a secondary offering. By the end of the year, its stake had declined to 34.7%.

In late 2016, after CD&R's holdings dropped below 50%, the Board began to consider strategic alternatives. During 2017, the Company contacted several potential transaction partners, but received only one indication of interest. The valuation was not attractive, and the process ended.

**C.    Old Ply Gem And Atrium Conduct Sale Process.**

Meanwhile, during late 2016, Old Ply Gem had started exploring strategic alternatives as well. Old Ply Gem was a leading North American manufacturer of products for the residential building industry whose shares traded on the New York Stock Exchange.

Throughout 2017, Old Ply Gem fielded numerous inquiries, including from CD&R. Old Ply Gem conducted a competitive process, and CD&R's bid prevailed. On January 31, 2018, CD&R and Old Ply Gem announced that CD&R would pay $21.64 per share to acquire Old Ply Gem in a leveraged buyout. The merger consideration reflected a premium of approximately 20% over Old Ply Gem's closing stock price on the day before the announcement. To fund the acquisition, Clayton, Dubilier & Rice Fund X, L.P. ("Fund X")

9

contributed equity of $425.2 million, and Old Ply Gem borrowed approximately $2,453.7 million in debt.[2]

On the same day that it announced its acquisition of Old Ply Gem, CD&R also announced that it had entered into an agreement to combine Old Ply Gem with Atrium Windows & Doors, Inc. ("Atrium"), a portfolio company owned by Golden Gate Capital. New Ply Gem would emerge as the surviving company.

On April 12, 2018, CD&R both acquired Old Ply Gem and combined it with Atrium to form New Ply Gem, thereby completing the Precedent Transaction. When negotiating the Precedent Transaction, CD&R and Golden Gate agreed to value Old Ply Gem's equity at $425.2 million and Atrium's equity at $212.8 million, resulting in an agreed-upon equity value for New Ply Gem of $638 million. After the Precedent Transaction, CD&R owned 70% of New Ply Gem's equity and had the right to appoint a majority of its directors.

New Ply Gem assumed Atrium's debt of $610.6 million. When combined with Old Ply Gem's existing borrowings, New Ply Gem carried approximately $3 billion in debt.

**D.      The Company Expresses Interest In New Ply Gem.**

On January 1, 2018, Metcalf took over as Chairman of the Board. On February 27, Metcalf and Riley told their fellow directors that a merger between the Company and New

---

[2] The CD&R Investment Advisor is the investment advisor for Fund X. It is reasonable to infer at this stage that within the CD&R private equity complex, Fund VIII, Fund X, and the CD&R Investment Advisor are, at a minimum, affiliates and under the common control of CD&R's principals. For simplicity, this decision continues to refer generally to CD&R.

Ply Gem—*i.e.*, the Challenged Transaction—was the Company's "most promising potential opportunity." Ex. 1 at 48. Metcalf and Riley made this statement just one month after CD&R had announced its intent to complete the Precedent Transaction.

On April 24, 2018, less than two weeks after the Precedent Transaction closed, Metcalf and Riley met with CD&R to discuss a merger between the Company and New Ply Gem. The CD&R delegation included Sleeper, Berges, and Zrebiec, the three CD&R partners who served on the Board. During the meeting, Metcalf and Riley gave a presentation about a business combination between the Company and New Ply Gem and told CD&R that the Company was hiring a financial advisor to explore a potential deal. *See* Compl. ¶ 73.

### E. The Committee

During a meeting of the Board on May 1, 2018, the directors discussed a potential combination between the Company and New Ply Gem. The four CD&R representatives on the Board participated in the discussion. VanArsdale remained present for the entire meeting. Sleeper, Zrebiec, and Berges remained present for the majority of the meeting. The Board reached a "consensus . . . that a merger with Ply Gem was the most promising potential opportunity" for the Company. Ex. 8 at 2.

During the May 1 meeting, the Board created a special committee (the "Committee") to review and evaluate the Challenged Transaction. The Board did not empower the Committee to look at other possible transactions. The Board did give the Committee the power to veto the Challenged Transaction, resolving that the Board "will not recommend, authorize, approve or otherwise endorse, effect or cause or allow to be

11

effected a Potential Transaction unless such transaction has been recommended to the Board by the Special Committee." Ex. 8 at 4.

The Committee had five members: Ball, Forbes, Holland, Martinez, and Metcalf. The resolutions gave the Committee the power to retain financial and legal advisors, but Metcalf and Company management had gotten out in front of the Committee on that issue. During the May 1 meeting, the Company's Chief Financial Officer, Mark E. Johnson, reported that at Metcalf's request, he had already contacted Evercore Inc. about acting as the Committee's financial advisor. He explained that he had also discussed with Evercore the personnel who would lead the engagement. Johnson represented that Evercore had no conflicts of interest vis-à-vis CD&R or New Ply Gem. Ex. 8 at 2. At the time, Evercore was working as a restructuring advisor for another CD&R portfolio company.

On May 3, 2018, the Committee convened for the first time. The Committee resolved to retain Evercore as its financial advisor. The Committee also chose to use the Company's existing outside counsel, Wachtell, Lipton, Rosen & Katz, as its legal advisor.

F.      **Evercore's Initial Valuation**

On May 10, 2018, Evercore contacted CD&R to obtain information about New Ply Gem. During a meeting on May 14, Evercore gave the Committee its initial impressions. Evercore recommended using Company common stock as an acquisition currency and advised that the Company's stockholders should end up owning approximately two-thirds of the combined entity, with New Ply Gem's stockholders owning the rest. This outcome would be achieved by exchanging New Ply Gem's equity for Company shares worth approximately $638 million.

12

In reaching these recommendations, Evercore valued New Ply Gem's equity using the amounts that CD&R and Golden Gate had negotiated when agreeing to the Precedent Transaction. Evercore observed that the relative valuations for the Precedent Transaction were struck at multiples in line with public peers, and Evercore used the same approach when analyzing the Challenged Transaction. Evercore explained that this approach was arguably generous to New Ply Gem, because its peer company multiples had declined since the announcement of the Precedent Transaction, and there was likely not another strategic buyer for New Ply Gem. Evercore also noted that combining the Company with New Ply Gem would benefit CD&R and Golden Gate by de-leveraging New Ply Gem's post-buyout capital structure. Under Evercore's analysis, CD&R and Golden Gate would not receive a premium for immediately flipping New Ply Gem to another CD&R portfolio company.

## G.    The Negotiations

The Committee instructed Evercore to engage in valuation discussions with CD&R. On May 17, 2018, Evercore met with Sleeper and Zrebiec. They pushed Evercore to value New Ply Gem's equity at $1.26 billion, a 97.5% premium to the value established by the Precedent Transaction.

On May 21, 2018, the Committee met to decide whether it should proceed with negotiations. Evercore reported that CD&R had proposed a valuation for New Ply Gem that was approximately "$600mm higher than the combined transaction value" from the Precedent Transaction. Ex. 16 at 18. Evercore then presented a wide range of possible ways to look at the possible combination and the relative contributions of the two companies.

13

*See id.* at 19–33. Riley provided the Committee with a management presentation that supported the Challenged Transaction. Compl. ¶ 85.

The next day, the full Board met. Sleeper gave a presentation in which he argued that the equity of the combined company should be allocated so that the Company's stockholders received 49% to 50% and New Ply Gem's stockholders received 50% to 52%. To justify this split, Sleeper cited:

> [New] Ply Gem's improved operating outlook and 2019 projected performance as well as the value that was expected to be created from synergies that were being generated from the [Precedent Transaction]; the value created by the flexible, attractive long-term capital structure that CD&R implemented at [New] Ply Gem in connection with [the Precedent Transaction] which could remain in place on favorable terms following a transaction with the Company; the likelihood that the greater scale, scope and growth prospects of [New] Ply Gem, given the [Precedent Transaction], would have the potential to increase the combined company's cash-earnings-per share multiple; that the combined company would be an industry leader, and a better platform for growth, including inorganic growth through mergers and acquisitions.

Ex. 18 at 7–8. Sleeper asserted that the Challenged Transaction was also good for the Company's stockholders because it was "highly unlikely" that the Company could "find another well-positioned business of scale" and that "[t]his is realistically the *only* window for [the Company] and [New Ply Gem] to come together." Compl. ¶ 88.

After the Board adjourned, the Committee met, and its members decided to engage in negotiations with CD&R. The Committee also discussed that "should the proposed merger be . . . completed, . . . Metcalf should serve as the chief executive officer of the combined company," an issue discussed at the earlier Board meeting. Compl. ¶ 87 (internal quotation marks omitted); *see* Ex. 13 at 3.

By May 31, 2018, the Committee and CD&R had agreed to an ownership split in which the Company's stockholders would receive 53% of the post-transaction equity and New Ply Gem's stockholders would receive 47%. The split valued New Ply Gem's equity at $1.154 billion, an 81% premium over the value established by the Precedent Transaction.

Over the next two weeks, the Committee and CD&R devoted significant resources to negotiating a new stockholders agreement that would impose "voting and transfer restrictions and limitations[] intended to restrict the ability of [CD&R] to control [the Company]" after the Challenged Transaction. Ex. 1 at 49; *accord* Ex. 1 at 52. The new stockholders' agreement preserves CD&R's consent rights but prevents CD&R from acquiring a majority of the Company's equity or from electing more directors than one less than half the Board. *See* Ex. 31 §§ 3.3(a)(i), 6.1.

## H. Approval Of The Challenged Transaction

Towards the end of the negotiations, the Committee asked CD&R to condition the Challenged Transaction on a majority-of-the-minority vote. CD&R rejected that term.

During a meeting on July 17, 2018, Evercore opined that terms of the Challenged Transaction were fair from a financial point of view to the Company and its stockholders. At that point, the negotiated equity split implicitly valued New Ply Gem's equity at $1.236 billion, a 94% premium over the value established by the Precedent Transaction just three months before. The Committee resolved to recommend the transaction to the Board. Later that day, the Board approved it. Ex. 30.

The Company announced the Challenged Transaction and noted that Metcalf would become Chairman and CEO of the combined entity. After the announcement, the

15

Company's stock price plummeted. By July 24, 2018, it had fallen 24% to $15.75 per share. On January 10, it closed at $7.80 per share, a 62% decline. Analysts questioned the valuation and the strategic rationale. *See* Compl. ¶¶ 106–07.

The Company's stockholders approved the Challenged Transaction during a meeting on November 15, 2018. In advance of the meeting, the Company disseminated a proxy statement in which the Board recommended that stockholders vote in favor of the Challenged Transaction. Ex. 1 (the "Proxy Statement").

On the record date for the meeting, there were 66,203,841 shares of Company common stock that were issued and outstanding. Of those shares, 64.6% (or 42,747,820 shares) were held by stockholders unaffiliated with CD&R or the Company's officers and directors. Of the unaffiliated shares, 55% (or 23,662,900 shares) voted in favor of the Challenged Transaction. On November 16, 2018, the Challenged Transaction closed.

## I.     This Litigation

On November 14, 2018, the plaintiff filed this lawsuit. Before filing suit, the plaintiff used Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220, to obtain books and records. The books and records appear to have consisted of the formal Board and Committee-level documents relating to the Challenged Transaction, such as the minutes of meetings, agendas for meetings, and presentations made during meetings. The plaintiff does not appear to have had access to internal communications or documents from CD&R.

The currently operative Complaint spans seventy-two pages and contains 162 numbered paragraphs. It contains three counts:

16

- Count I asserts a claim for breach of fiduciary duty against CD&R in its capacity as the Company's controlling stockholder. The specific CD&R parties named as defendants for purposes of this claim are Fund VIII and the CD&R Investment Advisor. The count is plead both as a direct claim and as a derivative claim.

- Count II asserts a claim for breach of fiduciary duty against the "Director Defendants." The complaint elsewhere defines this term to include Metcalf, Riley, Sleeper, VanArsdale, Zrebiec, Affeldt, Berges, Kremer, Martinez, Ball, Forbes, and Holland. This count is plead both as a direct claim and as a derivative claim.

- Count III asserts a claim for unjust enrichment against CD&R. This count is plead in the alternative as a means of reaching Fund VIII and the CD&R Investment Advisor in the event Count I falls short.

The defendants moved to dismiss the Complaint. For purposes of briefing their motions, the defendants organized themselves differently. Fund VIII, the CD&R Investment Advisor, Sleeper, Berges, Zrebiec, and VanArsdale (collectively, the "CD&R Defendants") filed one set of briefs. The other directors (collectively, the "Company Defendants") filed a second set of briefs.

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). When applying this standard, dismissal is

17

inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*[3]

When briefing the motions to dismiss, the defendants attached and relied on sixty-three exhibits. Many were materials that the Company produced in response to the Section 220 demand, which the parties agreed would be incorporated by reference in any eventual complaint. *See* Ex. 36 ¶ 14. Relying on these documents, the defendants asked the court to draw inferences in their favor, treating the motion to dismiss as if the court could weigh evidence and make findings of fact. Examples include the following:

- "The pleadings and documents before this Court on a motion to dismiss confirm that the [Challenged] Transaction was the culmination of a thoughtful and proper process . . . ." Dkt. 45 at 2.

- "After careful investigation during 2017 and early 2018, [the directors] identified a new possibility: the combination with [New] Ply Gem that Plaintiff now seeks to challenge." *Id.* at 3.

---

[3] The defendants also moved to dismiss the complaint pursuant to Rule 23.1 for failing to make demand or plead demand futility, but they invested so little in those arguments that they can be regarded as waived. The Company Defendants simply said that "[f]or the same reasons set forth above in Point I.C, plaintiff has failed to" show demand futility. Dkt. 47 at 59. The CD&R Defendants devoted two sentences to their Rule 23.1 argument. Dkt. 45 at 51–52. For their demand futility argument, they relied on the Company Defendants' brief. *See id.* at 48-49 ("All of the *derivative* claims fail for the reasons set forth in detail in the [Company] brief – beginning with the threshold failure to properly plead that demand was excused as futile such that Plaintiff has standing to assert these claims."). Because the defendants did not meaningfully argue demand futility, this decision does not reach the parties' debate over whether the claims are derivative, direct, or dual-natured. Assuming for the sake of argument that the claims are derivative, the plaintiffs can assert them because the defendants have not made meaningful arguments under Rule 23.1.

- "The Board and [Company] management carefully examined the Company's strategic options, including but not limited to a potential [t]ransaction with [New] Ply Gem, with the assistance of Bain Consulting." *Id.*

- "Once it became clear that the analysis supported pursuing the [Challenged] Transaction with [New] Ply Gem, the NCI Board – with the endorsement of CD&R and CD&R-affiliated directors – immediately implemented the processes required by Delaware law so that the Board could evaluate the potential [t]ransaction free from the influence of CD&R." *Id.* at 4.

- "The Special Committee drove a hard bargain." *Id.*

- The Committee's initial discussions "elicited a favorable offer from [New] Ply Gem under which each company would contribute 50% of the equity, that is, a 50/50% sharing ratio." *Id.* at 5.

- "After robust negotiations, the parties ultimately agreed on a 53/47% sharing ratio." *Id.*

Assertions that the process was "thoughtful and proper," the investigation and examination "careful," the transaction "free of influence," and the negotiations "robust" are characterizations that would require drawing inferences in favor of the defendants.

The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one.[4] The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document. But the doctrine does not change the pleading standard that governs a motion to dismiss.

---

[4] *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 & n.17 (Del. Ch. Feb. 21, 2014).

19

If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff had made a well-pled factual allegation, then the allegation will be credited. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiff also remains entitled to "all reasonable inferences." *Id.* at 897. Consequently, if a document supports more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference. *Id.*

## A.    CD&R's Status As A Controller

The headline issue for purposes of the motions to dismiss is whether the plaintiff has pled facts that make it reasonably conceivable that CD&R controlled the Company. The outcome of this issue ripples through the analysis of the breach of fiduciary duty claims asserted in Counts I and II.

For purposes of the claim against CD&R in Count I, CD&R's status as a controller is potentially dispositive. A stockholder that does not control the corporation is not a fiduciary and cannot be held liable for breaching non-existent duties. *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE). If it is not reasonably conceivable that CD&R was a controller, then Count I must be dismissed.

For purposes of both Counts I and II, CD&R's status as a controller affects the standard of review. "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Ams. Mining Corp. v. Theriault*, 51 A.3d

20

1213, 1239 (Del. 2012). The defendants did not follow the *MFW* blueprint by conditioning the Challenged Transaction upfront on both the approval of a committee and a favorable vote by a majority of the unaffiliated shares. *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2013), *overruled on other grounds by Flood v. Synutra, Int'l, Inc.*, 195 A.3d 754 (Del. 2018). Consequently, if it is reasonably conceivable that CD&R is a controller, then entire fairness provides the operative standard of review for purposes of the motion to dismiss. *See Tornetta v. Musk*, 2019 WL 4566943, at *4, *8–12 (Del. Ch. Sept. 20, 2019).

By contrast, if it is not reasonably conceivable that CD&R controlled the Company, then under *Corwin*, an irrebutable version of the business judgment rule will govern unless the plaintiff can plead a reasonably conceivable breach of the duty of disclosure. *See In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 746 (Del. Ch. 2016), *aff'd*, 145 A.3d 697 (Del. 2017) (TABLE). If *Corwin* applies, then the only remaining basis to contest the Challenged Transaction would be waste, a claim that the complaint does not assert and which is available only in theory, because the fact of stockholder approval indicates that the Challenged Transaction was on terms that persons of ordinary, sound judgment could accept. *See Singh v. Attenborough*, 137 A.3d 151, 152 & n.3 (Del. 2016) (ORDER).

Moreover, if it is not reasonably conceivable that CD&R controlled the Company and *Corwin* is not available because of a well-pled disclosure claim, then the traditional rebuttable version of the business judgment rule will govern unless it is reasonably conceivable that when approving the Challenged Transaction, the Board lacked a disinterested and independent majority. And even if the Board did lack a disinterested and independent majority, then the business judgment rule would still apply if the Board relied

21

on the Committee's recommendation, unless the Committee itself lacked a disinterested and independent majority. *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 24–29 (Del. Ch. 2014).

The Committee had five members, and the Complaint only challenges the independence of Metcalf. Consequently, if it is not reasonably conceivable that CD&R controlled the Company, then the business judgment rule will apply, resulting in the dismissal of the claims for breach of fiduciary duty asserted in Counts I and II.

### 1. The Test For Controlling Stockholder Status

"Delaware law imposes fiduciary duties on those who effectively control a corporation." *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014); *see S. Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919). One method of pleading control sufficient to impose fiduciary duties is to allege that a defendant has the ability to exercise a majority of the corporation's voting power.[5] At the time of the Challenged

---

[5] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (observing that a stockholder becomes a fiduciary if it "owns a majority interest in . . . the corporation" (internal quotation marks omitted)); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling stockholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation . . . .").

22

Transaction, CD&R controlled 34.8% of the Company's voting power, so the Complaint does not support an inference of control under that standard.[6]

Another means of pleading control is to allege facts that support a reasonable inference that the defendant in fact "*exercise[d] control* over the business affairs of the corporation." *Lynch*, 638 A.2d at 1113 (internal quotation marks omitted). A plaintiff can plead that a defendant had the ability to exercise actual control by alleging facts that support a reasonable inference of either (i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction.[7]

To plead that the requisite degree of control exists generally, a plaintiff may allege facts supporting a reasonable inference that a defendant or group of defendants exercised

---

[6] Fund VIII owned shares comprising 34.4% of the Company's voting power. Sleeper, Zrebiec, and Berges each held 34,630 shares, bringing the total to 34.6%. The CD&R Investment Advisor owned another 101,251 shares, 2,637 unvested restricted shares, and 16,738 unvested restricted stock units, bringing the total to 34.8%.

[7] *See Basho*, 2018 WL 3326693, at *25 ("The requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged." (internal quotation marks omitted)); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("[T]he plaintiffs need not demonstrate that KKR oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough."); *Williamson*, 2006 WL 1586375, at *4 ("Plaintiff can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged."). *See generally* Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 1.10(a) (1994) (defining controlling stockholder as a person who has the power to vote more than 50% of the voting equity or "[o]therwise exercises a controlling influence over the management or policies of the corporation *or the transaction or conduct in question*" (emphasis added)).

23

sufficient influence "that they, as a practical matter, are no differently situated than if they had majority voting control." *PNB Hldg.*, 2006 WL 2403999, at \*9. One means of doing so is to plead that the defendant, "as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes." *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003).

To plead that the requisite degree of control existed for purposes of a particular transaction or decision, a plaintiff does not have make such a pervasive showing. *See Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at \*4 (Del. Ch. Aug. 25, 2006) ("[P]ervasive control over the corporation's actions is not required."). Rather, the plaintiff must plead facts supporting a reasonable inference that the defendant in fact exercised actual control "with regard to the particular transaction that is being challenged." *Id. See generally* 1 Stephen A. Radin, *The Business Judgment Rule* 1129 (6th ed. 2009).

"The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint."[8] "[T]here is no magic formula to

---

[8] *Williamson*, 2006 WL 1586375, at \*6; *accord In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at \*13 (Del. Ch. Mar. 28, 2018) ("Whether a large blockholder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual and it is a difficult question to resolve on the pleadings" (internal quotation marks and alterations omitted)), *appeal refused sub nom. Musk v. Arkansas Teacher Ret. Sys.*, 184 A.3d 1292 (Del. 2018) (TABLE); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 550–51 (Del. Ch. 2003) (same); *see In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at \*9 n.33 (Del. Ch. Nov. 26, 2014) ("Whether or not a particular CEO and sizeable stockholder holds more practical power than is typical should not be decided at the motion to dismiss stage if a plaintiff pleads facts sufficient to raise the inference of

24

find control; rather, it is a highly fact specific inquiry."[9]

## 2. Potential Sources Of Control

It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control. *See Basho*, 2018 WL 3326693, at *26. Examples include, but are not limited to, (i) relationships with particular directors, (ii) relationships with key managers or advisors, (iii) the exercise of contractual rights to channel the corporation into a particular outcome, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier. *See id.* (collecting authorities).

Broader indicia of effective control also play a role. *Id.* at *27. Examples include, but are not limited to, ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a majority), decisional rules in governing documents that enhance the power of a minority stockholder or board-level positon, and the ability to exercise outsized influence in the board room or on committees, such as through high-status roles like CEO, Chairman, or founder. *See id.* (collecting authorities).

---

control."), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

[9] *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014)); *Zhongpin*, 2014 WL 6735457, at *6–7 (noting the inquiry of "whether or not a stockholder's voting power and managerial authority, when combined, enable him to control the corporation . . . is not a formulaic endeavor and depends on the particular circumstances of a given case").

"Invariably, the facts and circumstances surrounding the particular transaction will loom large." *Id.* at *28. A plaintiff may allege facts indicating that a defendant insisted on a particular course of action even though other fiduciaries or advisors resisted or had second thoughts. Or a plaintiff may allege that the defendant engaged in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior.

"Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing. . . . [A] reasonable inference of control at the pleading stage[] typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result." *Id.* Sources of influence and authority must be evaluated holistically, because they can be additive. Different sources of influence that would not support an inference of control if held in isolation may, in the aggregate, support an inference of control.[10]

---

[10] The Federal Reserve's recently adopted regulations on when a rebuttable presumption of control arises for a bank holding company provide a helpful illustration of how different sources of influence can interact. The regulations consider holistically factors such as the potential controller's level of stock ownership, the number of its representatives who serve on the board, whether a representative serves as board chair, the potential controller's level of representation on board committees, the number of its representatives who serve in senior management positions, whether a representative serves as CEO, the existence of any significant business or commercial relationships, and the existence of any significant contractual rights, such as veto rights that limit board discretion. *See* Fed. Reserve Sys., *Control and Divestiture Proceedings*, No. R-1662, at 16–56 (Jan. 30, 2020) (effective April 1, 2020) (to be codified at 12 C.F.R. pts. 225 & 238), https://www.federalreserve.gov/aboutthefed/boardmeetings/files/control-rule-fr-notice-20200130.pdf.

### 3.  The Complaint's Allegations Regarding CD&R

The Complaint's allegations support a reasonable pleading-stage inference that CD&R exercised control over the Company. No one source of influence is dispositive. Collectively, they support a reasonable pleading-stage inference of control.

#### a.  Board Composition

An obvious source of influence that can lead to an inference of actual control is existence of relationships between the alleged controller and members of a company's board of directors.[11] In this case, the nature of the relationships between CD&R and a majority of the directors contributes to a reasonable inference of control.

As a threshold matter, the ability of an alleged controller to designate directors (albeit less than a majority) is an indication of control.[12] Under the Stockholders

---

[11] *See, e.g.*, *Tesla.*, 2018 WL 1560293, at *17 (considering defendant's relationships with directors as factor supporting reasonable inference of control); *Calesa*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (finding allegations supported inference defendant was a controlling stockholder where it was reasonably conceivable "to infer that a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with," the defendant); *Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (recognizing defendant can exercise control over a decision if defendant "had achieved control or influence over a majority of directors through non-contractual means, such as affiliation or aligned self-interest"); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *11 (Del. Ch. Oct. 6, 2011) (drawing inference of control where defendant dominated majority of directors); *Williamson*, 2006 WL 1586375, at *4 ("The fact that an allegedly controlling shareholder appointed its affiliates to the board of directors is one of many factors Delaware courts have considered in analyzing whether a shareholder is controlling.").

[12] *See, e.g.*, *Lynch*, 638 A2d at 1112, 1114–15 (considering right of Alcatel U.S.A. Corporation to designate five of eleven directors of Lynch Communications Systems, Inc. during course of affirming trial court's finding of actual control); *In re Loral Space &*

27

Agreement, as long as CD&R controlled at least 10% of the Company's voting power, then CD&R could nominate a proportionate number of directors to the Board, rounded to the nearest whole number. *See* SA § 3.1(b)(i). From December 2017 through the Challenged Transaction, this provision gave CD&R the right to nominate four of the Board's twelve directors, comprising one-third of the seats. CD&R filled those seats with four individuals that it controlled.

In addition to the directors it controlled, CD&R had longstanding ties with Affeldt and Kremer. Delaware courts have recognized that past relationships and payments can support "a reasonable inference of 'owningness' sufficient to create a reasonable doubt" about a director's ability to act independently.[13] "Although mere recitation of the fact of

*Commc'ns Inc.*, 2008 WL 4293781, at \*20 (Del. Ch. Sept. 19, 2008) (applying entire fairness where stockholder controlling 36% of voting power appointed three of eight directors and had relationships with two others); *Williamson*, 2006 WL 1586375, at \*4 (considering that stockholders collectively holding a 17.1% interest could nominate two of five directors when drawing an inference of control); *Friedman v. Beningson*, 1995 WL 716762, at \*5 (Del. Ch. Dec. 4, 1995) (considering Chairman, CEO, and President who held 36% of voting power in public company and could influence a second director; observing that "[f]rom a practical perspective, this confluence of voting control with directoral and official decision making authority . . . is . . . itself quite consistent with control of the board"). *Cf. Donnelly v. Keryx Biopharm., Inc.*, 2019 WL 5446015, at \*5 (Del. Ch. Oct. 24, 2019) (finding for purposes of Section 220 inspection that there was a credible basis to infer that the beneficial owner of approximately 39% of a company's common stock with a contractual right to appoint one director and one observer to a seven-director board was a *de facto* controller); *Kosinski v. GGP Inc.*, 214 A.3d 944, 953 (Del. Ch. 2019) (finding for purposes of Section 220 inspection that there was a credible basis to infer that stockholder with a 34% interest and power to replace one-third of the board of directors "was a *de facto* controller").

[13] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at \*42 (Del. Ch. Jan. 25, 2016); *see Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016) (inferring

past business or personal relationships will not make the Court automatically question the

independence of a challenged director, it may be possible to plead additional facts

that two directors were not independent of a controller for purposes of Rule 23.1 where they had "a mutually beneficial network of ongoing business relations" based on past investments and service on company boards); *Primedia*, 910 A.2d at 261 n. 45 (holding on motion to dismiss that directors who had "substantial past or current relationships, both of a business and of a personal nature, with [a controller]" were not independent); *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *12 (Del. Ch. June 30, 2005) ("Latiolais had worked for the Common Directors for almost twenty years and had become a wealthy individual in their employ. To argue that Latiolais was independent of the Common Directors because he formally severed ties with some Freeport entities does not take into account the nature and extent of his overwhelming, career-long involvement with Freeport entities, including the entire span of MOXY's life. Delaware law recognizes that such extensive ties can operate as an exception to the general rule that past relationships do not call into question a director's independence."); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *3 (Del. Ch. Apr. 28, 2003) (holding in post-trial opinion that director who had been an employee of controller for more than ten years was not disinterested and independent in decision to evaluate controller's proposed merger), *aff'd*, 840 A.2d 641 (Del. 2003) (TABLE); *In re The Ltd., Inc.*, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("One may feel 'beholden' to someone for past acts as well. It may reasonably be inferred that Mr. Wexner's gift of $25 million to Ohio State was, even for a school of that size, a significant gift. While the gift was not to Gee personally, it was a positive reflection on him and his fundraising efforts as university president to have successfully solicited such a gift. In this context, even though there can be no 'bright line' test, a gift of that magnitude can reasonably be considered as instilling in Gee a sense of 'owingness' to Mr. Wexner." (footnote omitted)); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Sept. 28, 2001) (recognizing that "past benefits conferred by [the allegedly dominating director], or conferred as the result of [that director's] position with Ply Gem, may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised"); *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001) (observing when considering allegations of interest and lack of independence that "[t]he facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved"); *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *5–7 (Del. Ch. Apr. 22, 1997) (holding on a motion to dismiss that directors were not independent based on history of dealing and overlapping governance relationships).

concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction." *Orman v. Cullman*, 794 A.2d 5, 27 n.55 (Del. Ch. 2002). In other words, "the plaintiff cannot just assert that a close relationship exists, but when the plaintiff pleads specific facts about the relationship—such as the length of the relationship or details about the closeness of the relationship—then [the trial court] is charged with making all reasonable inferences from those facts in the plaintiff's favor." *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (discussing more onerous pleading standard under Rule 23.1).

The Company's own disclosures recognized CD&R's influence over Affeldt and Kremer. When CD&R initially invested in the Company, it bargained for the right to place three directors immediately on the Board and named Sleeper, Berges, and Kremer. Shortly after the transaction closed, CD&R exercised its right to add two more directors and named Zrebiec and Affeldt. Although Kremer and Affeldt were nominally independent, the Company disclosed that with the appointment of the two additional directors, "[t]he CD&R Funds will have the ability, subject to the fiduciary duties of the individual directors, to control the decisions of the Board." Ex. 2 at 3. The disclosure thus described Kremer and Affeldt as directors who, subject to their fiduciary duties, were subject to CD&R's control for purposes of Board-level decisions. The defendants argue that this description merely recognized CD&R's ownership at the time of a mathematical majority of the Company's voting power, and that is one possible reading, but the description focuses on Board-level decisions and Board-level control. At the pleading stage, the plaintiff is entitled to the benefit of the inference that the disclosure meant what it said by describing CD&R as

30

exercising control at the Board level through the five directors it had appointed, including Affeldt and Kremer.

In addition to this description, the Complaint pleads other facts that contribute to a reasonable pleading-stage inference that Affeldt was subject to CD&R's influence and control. Affeldt has worked for CD&R portfolio companies or served on their boards for twenty-seven years. In 1991, CD&R hired Affeldt to work at Lexmark, one of its portfolio companies, in the human resources department. In 1996, Affeldt was promoted to head that department. Since leaving Lexmark in 2003, Affeldt has predominantly worked as a CD&R director appointee at CD&R portfolio companies, for which she has received at least $2.45 million. In addition to the Company, CD&R appointed Affeldt to serve on the boards of SIRVA, Inc., Sally Beauty Holdings, and HD Supply Holdings, all of which were CD&R-portfolio companies when CD&R placed Affeldt on the board.

At the pleading stage, the extent of Affeldt's relationship with CD&R is sufficient to support an inference of beholden-ness. The defendants argue that some of the relationships between CD&R and Affeldt are stale. To the contrary, the history of connections between CD&R and Affeldt suggests a persistent and ongoing relationship. The defendants also argue that the plaintiff has not pled sufficient facts to support an inference that Affeldt's remuneration from positions which inferably flowed from her relationship with CD&R is material to her. Specific information about the wealth of particular individuals is not generally available and is also not something that can usually be obtained using Section 220, so the plaintiffs have not been able to frame their allegations about Affeldt's financial circumstances using dollars and cents. Nevertheless, the

31

magnitude of the remuneration she has received is sufficiently large to support an inference

of materiality at the pleading stage, particularly given the allegation in the complaint that

most, if not all, of Affeldt's income has come from entities affiliated with CD&R since her

retirement from Lexmark in 2003.[14]

---

[14] *See Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020–21 (Del. 2015) (inferring at pleading stage that director fees of $165,000 were material where they allegedly constituted 30% to 40% of defendant's total annual income); *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997) (finding after trial that director was beholden to interested party because of prior one-year consultancy during which he received $10,000 per month and more than $325,000 in bonuses); *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993) (inferring at pleading stage that compensation of $300,000 was material); *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *17 (Del. Ch. Mar. 19, 2018) (inferring at pleading stage that director fees of $468,645 were material); *Cumming ex rel. New Senior Inv. Gp., Inc. v. Edens*, 2018 WL 992877, at *17 (Del. Ch. Feb. 20, 2018) (inferring at pleading stage that fees constituting 60% of director's identifiable income were material); *Kahn v. Portnoy*, 2008 WL 5197164, at *8–9 (Del. Ch. Dec. 11, 2008) (inferring at pleading stage that director fees of $160,000 were material); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *34 (Del. Ch. May 3, 2004, revised June 4, 2004) (finding after trial that consulting and director fees totaling $150,000 in one year and $170,000 in another were material); *In re eBay, Inc. S'holders Litig.*, 2004 WL 253521, at *2–3 (Del. Ch. Jan. 23, 2004) (inferring at pleading stage that option awards worth "potentially millions of dollars" dependent on whether defendant "retains his position as a director" were material); *The Ltd.*, 2002 WL 537692, at *4 (inferring at pleading stage that consulting fees of $150,000 were material to a university administrator); *Orman*, 794 A.2d at 30 (inferring at pleading stage that consulting fees of $75,000 were material); *In re Ply Gem*, 2001 WL 755133, at *8–9 (inferring at pleading stage that consulting fees of $91,000 were material); *Beningson*, 1995 WL 716762, at *5 (inferring at pleading stage that consulting fees of $48,000 were material); *In re MAXXAM, Inc./Federated Dev. S'holders Litig.*, 659 A.3d 760, 774 (Del. Ch. 1995) (declining to approve settlement and noting that consulting fees of $250,00 were likely material to a defendant who "recently emerged from personal bankruptcy"); *see also Shaev v. Saper*, 320 F.3d 373, 378 (3d Cir. 2003) (inferring at pleading stage that consulting fees of $135,500 plus a discretionary bonus of $25,000 were material); *cf. Kahn v. Dairy Mart Convenience Stores, Inc.*, 1996 WL 159628, at *6 (Del. Ch. Mar. 29, 1996) (denying summary judgment based on dispute of fact as to whether consulting fees were material); *In re NVF Co. Litig.*, 1989 WL 146237, at *4 (Del. Ch. Nov. 22, 1989) (inferring at

For similar reasons, the Complaint pleads facts sufficient to support a reasonable pleading-stage inference that Kremer was subject to CD&R's influence and control. In addition to the Company's description of Kremer to that effect, Kremer worked for years at Emerson Electric Co., where Berges was President and Vice Chairman. Since retiring from Emerson in 2007, Kremer's only employment has been as a director, and the Company is the only public company where Kremer has served. From 2009 through the Challenged Transaction, Kremer received approximately $1 million from his directorship. At the pleading stage, it is reasonable to infer that this remuneration constituted a material portion of Kremer's income as a retiree.

The Complaint's allegations about Metcalf also contribute to a reasonable pleading-stage inference of control, even though they reduce to just one potentially compromising relationship. Early on during the negotiations surrounding the Challenged Transaction, Metcalf understood that he would become Chairman and CEO of the combined company. It is reasonable to infer at the pleading stage that the prospect of serving as Chairman and CEO of the combined company induced Metcalf to favor the Challenged Transaction. *See Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28, 2015) (considering fact that interested party had nominated directors to current board and other boards and inferring that the directors could "expect to be considered for directorships in companies the [interest party] acquire[s] in the future"). The defendants

pleading stage that director fees received other companies controlled by interested party were sufficient to establish a lack of independence).

argue that the decision to appoint Metcalf to this position was made too late in the process to have influenced any of his actions, but it is reasonable to infer at the pleading stage that the prospect of the appointment was discussed or foreseeable during earlier phases.

The parties have debated Riley's independence. At the time of the Challenged Transaction, Riley was the Company's CEO. He was hired as a senior executive at the Company in December 2014 when CD&R owned 57% of the Company's stock and controlled a majority of its Board seats. In July 2017, Riley was named CEO and appointed to the Board and to the Executive Committee. For the years 2015, 2016 and 2017, Riley received total compensation of $2,153,961, $2,299,276 and $2,511,814, respectively— amounts that can reasonably be inferred to have comprised the bulk of his income.

From these facts, it is reasonable to infer at the pleading stage that Riley would feel a sense of owing-ness to CD&R. Moreover, if other factors point in favor of a reasonable inference that CD&R is a controller, then Riley's presence on the Board will reinforce that inference rather than undermine it. Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller.[15] In those circumstances, a reasonable doubt exists

---

[15] *Rales*, 634 A.2d at 937 (holding that President and CEO of corporation could not impartially consider a litigation demand which, if granted, would have resulted in a suit adverse to significant stockholders); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002) ("In the case of [the CEO], to accept such a [litigation] demand would require him to decide to have Student Loan sue Citigroup, an act that would displease a majority stockholder in a position to displace him from his lucrative CEO position."); *Mizel v. Connelly*, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999) (observing that President and CEO of corporation whose position constituted his principal

as to whether the officer "can impartially consider a demand" that would involve taking action "materially adverse to [the controller's] interests." *Mizel*, 1999 WL 550369, at *3. When officers "derive their principal income from their employment," that fact "powerfully strengthens the inference" that the officers could not consider a demand on the merits, because "it is doubtful that they can consider the demand . . . without also pondering whether an affirmative vote would endanger their continued employment." *Id.* If the other dimensions of the multi-factor analysis support an inference that CD&R is a controller, then Riley is not independent.

At the other end of the spectrum, the Complaint does not identify any compromising relationships or sources of influence between CD&R and Martinez, Ball, Forbes, and Holland. These directors are independent and disinterested for pleading-stage purposes.

---

employment was not independent for demand-futility purposes where underlying transaction was between corporation and its controller); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [the CEO and significant stockholder's interest] in the transaction that the plaintiff attacks."); *see Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *9 (Del. Ch. Oct. 10, 2006, revised Oct. 16, 2006) (holding that reasonable doubt existed as to ability of insider managers of LLC to address a litigation demand focusing on the entity's controllers); *see also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ("There may be a reasonable doubt about a director's independence if his or her continued employment and compensation can be affected by the directors who received the challenged benefit."); *In re Cooper Cos., Inc. S'holders Deriv. Litig.*, 2000 WL 1664167, at *6–7 (Del. Ch. Oct. 31, 2000) (finding reasonable doubt existed as to ability of two directors to consider litigation demand addressing alleged misconduct by other directors where both reported to board as officers, one as CFO and Treasurer and the other as Vice President and General Counsel).

CD&R's control over four directors and its relationships with four others contribute to a reasonable inference that CD&R exercised actual control over the Company. This decision need not and does not hold that the relationships standing alone would support a reasonable inference of control. In conjunction with other indicators of control, however, the relationships support the necessary pleading-stage inference.

### b. Block Size

Another obvious factor that can contribute to an inference of actual control is the size of the equity stake that the alleged controller holds. The search for guidance on this issue can be unsatisfying, because the interaction of block size with other factors prevents clear patterns from emerging. After reviewing a non-exhaustive list of ten significant cases, a prior decision failed to reveal "any sort of linear, sliding scale approach where by a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder." *Crimson Expl.*, 2014 WL 5449419, at *10. Illustrating the point, the decision noted that "[i]n *Cysive*, Chief Justice Strine, writing as a Vice Chancellor, found a 35% stockholder controlled the corporation, while, in *Western National*, Chancellor Chandler held that a 46% stockholder was not a controller." *Id.* The decision concluded that "the scatter-plot nature of the holdings highlight[ed] the importance and fact-intensive nature" of the analysis. *Id.* It is often the case that "the level of stock ownership is not the predominant factor."[16]

---

[16] *FrontFour Capital Gp. LLC v. Taube*, 2019 WL 1313408, at *21 (Del. Ch. Mar. 11, 2019); *see Tesla*, 2018 WL 1560293, at *14 ("[T]here is no absolute percentage of

36

All else equal, a relatively larger block size *should* make an inference of actual control more likely, even though the interplay with factors makes the correspondence difficult to perceive. The relationship derives from simple mathematics. A stockholder who owns a mathematical majority of the corporation's voting power has the ability to exercise affirmative control. As a result, "[i]n the absence of devices protecting the minority stockholders, stockholder votes are likely to become mere formalities where there is a majority stockholder." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994). Under the Delaware General Corporation Law, the most fundamental changes can be effectuated only if approved by a majority of the outstanding voting power. *See* 8 *Del. C.* § 242(b)(1) (charter amendment); *id.* § 251(c) (merger); *id.* § 275(b) (dissolution). A stockholder with mathematical-majority control can deliver that vote. The stockholder can also take action by written consent, which functionally converts votes that otherwise would require a lesser level of voting power into votes that require a majority of the outstanding voting power. *See id.* § 228(a) (requiring a consent "signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted"). A stockholder with mathematical-majority control can act by consent to remove directors and fill the resulting vacancies with new ones. *See id.* §§ 141(k), 211(b), 216(2).

---

voting power that is required in order for there to be a finding that a controlling stockholder exists." (quoting *PNB Hldg.*, 2006 WL 2403999, at *9).

Once the stockholder's holdings dip below a majority, the stockholder needs the votes of other investors to take action by written consent or to obtain a vote that requires a majority of the outstanding shares. But a large stockholder with less than a majority of the voting power retains considerable flexibility to take action at a meeting. In that context, once a quorum is present, the general standard for taking action is the affirmative vote of a majority of the shares present and entitled to vote. *See id.* § 216(2). For the election of directors, the general standard is a plurality of the shares present and entitled to vote. *See id.* § 216(3). Meetings typically attract participation from just under 80% of the outstanding shares.[17] At that level, the holder of a 40% block can deliver the vote needed to prevail at a meeting.

The power conferred by a large block extends further because stockholders who oppose the blockholder's position can only prevail by polling votes at supermajority rates. *See Mizel*, 1999 WL 550369, at *3 n.1. The following table shows the effect that illustrative

---

[17] *See* Kobi Kastiel & Yaron Nili, *In Search of the "Absent" Shareholders: A New Solution to Retail Investors' Apathy*, 41 Del. J. Corp. L. 55, 61 (2016) (finding that overall "the total percentage of shares that were not voted in each of the matters standing for a vote at S&P 500 companies" in 2015 was 21.7%); Simon Lesmeister, Peter Limbach, & Marc Goergen, *Trust and Shareholder Voting* 31, 53 (July 22, 2018, revised Sept. 14, 2019) (European Corporate Governance Institute (ECGI) – Finance Working Paper No. 569/2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3216765 (finding that average voter participation at annual meetings for U.S. Russell 3000 firms from 2003 to 2015 was 79%); Dragana Cvijanović, Moqu Groen-Xu, & Konstantinos E. Zachariadis, *Free-riders and Underdogs: Participation in Corporate Voting* 4, 11 (May 2019) (Working Paper), http://abfer.org/media/abfer-events-2019/annual-conference/corporate-finance/AC19P2056_Free-riders_and_Underdogs.pdf (finding that average total voter participation for Russell 3000 firms from 2003 to 2013 was 77%).

levels of block ownership have on voting outcomes, assuming a meeting where holders with 80% of the voting power turn out, and the standard is a majority of the shares present and entitled to vote.[18] Under these assumptions, anything over 40% of the voting power is sufficient to prevail.

| Block Size | Unaffiliated Shares Present | % of Unaffiliated That Blockholder Needs To Win | % of Unaffiliated That Opponents Need To Win | Vote for Blockholder If Unaffiliated Splits 50/50 |
|---|---|---|---|---|
| 35 | 45 | 13% | 91% | 72% |
| 30 | 50 | 22% | 82% | 69% |
| 25 | 55 | 29% | 75% | 66% |
| 20 | 60 | 35% | 68% | 63% |
| 10 | 70 | 44% | 58% | 56% |

In other words, if the holder of a 35% block favors a particular outcome at a meeting, then the blockholder will win as long as holders of 1-in-7 shares vote the same way. The opponents must garner over 90% of the unaffiliated shares to win.[19] This court has

---

[18] For simplicity, the calculations assume a company with one class of common stock and 100 shares outstanding. The blockholder owns the designated number of shares with unaffiliated holders owning the rest. The assumption of 80% turnout means that 80 shares are present and entitled to vote at the meeting and the affirmative vote of 41 shares is required to prevail.

[19] It is likely that turnout would rise if the opponents of a measure ran a proxy contest. *See, e.g.*, *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1382–83 (Del. 1995) (assuming a 90% turnout in a contested election involving a high concentration of institutional investors); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 340 (Del. Ch. 2000) (finding that a turnout of 90% in a contested solicitation at a public company would be realistic); *Robert M. Bass Gp., Inc. v. Evans*, 552 A.2d 1227, 1244 (Del. Ch. 1988) (crediting testimony that 80–83% of eligible shares tend to vote in contested matters). The larger number of unaffiliated shares present at the meeting increases the absolute number of votes needed to win. At the same time, the larger number of unaffiliated shares in the denominator affects the percentages needed to win. The change does not significantly undermine the blockholder's advantage. For example, with a 35% blockholder and 90%

39

described disinterested majorities of 60% and 66 2/3% as "more commonly associated with sham elections in dictatorships than contested elections in genuine republics." *Chesapeake*, 771 A.2d at 342; *see Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 117 (Del. Ch. 2011) (noting that no insurgent had ever achieved a 67% vote and that polling votes at this level was not realistically attainable).

Based on the math alone, large blocks at levels of 35% and below carry significant influence. A large block also gives its owner additional rhetorical cards to play in the boardroom, particularly if the owner can claim to have the most at stake. Taking into account the influence that a large block carries, the pled fact of CD&R's 34.8% contributes to a reasonably conceivable inference that CD&R exercised actual control over the Company at the time of the Challenged Transaction.[20]

---

turnout, the number of votes needed to win rises to 46, the percentage of the unaffiliated that the blockholder needs to win rises to 20% (11/55), and the percentage of the unaffiliated that the opponents need to win falls to 84% (46/55). At the other end of the spectrum, with a 10% blockholder and 90% turnout, the number of votes needed to win remains 46, the percentage of the unaffiliated that the blockholder needs creeps up to 45% (36/80), and the percentage of the unaffiliated that the opponents need to win creeps down to 57.5% (46/80).

[20] *See Robbins & Co. v. A.C. Israel Enters., Inc.*, 1985 WL 149627, at *5 (Del. Ch. Oct. 2, 1985) (recognizing that "[t]his Court and others have recognized that substantial minority interests ranging from 20% to 40% often provide the holder with working control" and collecting authorities); *see also* 8 *Del. C.* § 203(c)(4) ("A person who is the owner of 20% or more of the outstanding voting stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary"); Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 1.10(b) (1994)

### c. The Voting Rights And Restrictions In The Stockholders Agreement

In this case, CD&R's ownership of 34.8% of the equity and its ability to exercise those rights as a stockholder must be evaluated in conjunction with the rights and restrictions that appear in the Stockholders Agreement. The provisions in that agreement cut in both directions. Some of the provisions give CD&R greater rights than a stockholder that controlled a majority of the outstanding voting power would possess. Other provisions limited CD&R's ability to exercise its voting power for purposes of electing directors.

As discussed in the Factual Background, the Stockholders Agreement granted CD&R a lengthy list of consent rights that enabled CD&R to block actions that the Board otherwise would have the ability to take unilaterally, without stockholder approval. The consent rights encompassed both significant corporate and financing transactions, as well as more basic corporate governance issues like increasing the size of the Board or amending the bylaws. These blocking rights weigh in favor of an inference that CD&R exercised control over the Company generally by giving CD&R power over the Company beyond what the holder of a mathematical majority of the voting power ordinarily could wield. The holder of a majority of the outstanding voting power could vote against transactions that required stockholder approval, but it could not exercise a stockholder level veto over actions that the board of directors could take unilaterally. To intervene on those

---

(recommending a rebuttable presumption of control when a person directs more than 25% of a corporation's voting power).

issues, the holder of a mathematical majority of the voting power would need to act through director representatives on the board who would be clearly acting as fiduciaries when making decisions. The blocking rights in the Stockholders Agreement empowered CD&R to limit a range of board actions at the stockholder level and to do so by exercising contract rights that CD&R could argue did not implicate fiduciary duties. *See Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999).

Contractual rights that do not amount to a significant source of general control can, depending on the circumstances, give rise to an inference of transaction-specific control, because the holder of the contract rights can use them to channel a corporation into a particular outcome by blocking other paths.[21] Although a blocking right standing alone is unlikely to support a reasonable inference of control,[22] in the context of a particular factual

---

[21] *See Williamson*, 2006 WL 1586375, at *4 (noting that "board veto power *in and of itself*" does not give rise to control but that defendants' "veto power is significant for analysis of the control issue" because it indicated that defendants "had the ability to shut down the effective operation of the At Home board of directors by vetoing board actions"); Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties in Burnout/Cramdown Financings*, 20 J. Corp. L. 593, 601 (1995) (discussing role of blocking rights as source of control for venture capital funds over portfolio companies).

[22] *See Thermopylae Capital*, 2016 WL 368170, at *13 ("Under Delaware law, however, contractual rights held by a non-majority stockholder do not equate to control, even where the contractual rights allegedly are exercised by the minority stockholder to further its own goals."); *see also id.* at *14 ("[A] stockholder who—via majority stock ownership or through control of the board—operates the decision-making machinery of the corporation, is a classic fiduciary; in controlling the company he controls the property of others—he controls the property of the non-controlling stockholders. Conversely, an individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary."). C*ompare Superior Vision*, 2006 WL 2521426, at *5 ("In

scenario, it can be a highly effective form of control. The paradigmatic example involves a cash-burning, asset-light company that does not yet generate sufficient revenue to finance its business plan and has reached the point where it requires external financing. *See Basho*, 2018 WL 3326693, at \*29. Under those circumstances, a party that has a veto right over the company's access to financing can "sit on the company's lifeline, with the ability to turn it on or off."[23] When cash is like oxygen, the ability to choke off the air supply is a strong indicator of control, particularly if there are factual allegations (and later evidence) that the party holding the veto right used it to force the company into a vulnerable position. *Basho*, 2018 WL 3326683, at \*29–31.

In this case, the Complaint does not plead that CD&R used blocking rights to cut off other alternatives or that CD&R threatened to do so. Nor does the pleading suggest that

───────────────

sum, a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose.") *with id.* ("There may be circumstances where the holding of contractual rights, coupled with a significant equity position and other factors, will support the finding that a particular shareholder is, indeed, a 'controlling shareholder,' especially if those contractual rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions.").

[23] Bartlett & Garlitz, *supra*, at 601; *see* Manuel A. Utset, *Reciprocal Fairness, Strategic Behavior & Venture Survival: A Theory of Venture Capital-Financed Firms*, 2002 Wis. L. Rev. 45, 66 ("A venture capitalist's leverage is further strengthened by contract provisions giving it a monopoly over future financing."). There is extensive literature that discusses the use of staged financing as a control device. *See, e.g.*, Darian M. Ibrahim, *The (Not So) Puzzling Behavior of Angel Investors*, 61 Vand. L. Rev. 1405, 1413 (2008) (summarizing role of staged financing); Paul A. Gompers & Josh Lerner, *The Venture Capital Cycle* 139 (2000) (describing staged financing as "the most potent control mechanism a venture capitalist can employ").

the shadow of the blocking rights led the directors to act differently than they would have. CD&R's blocking rights instead weigh in favor of an inference that CD&R exercised control over the Company generally by giving CD&R power over the Company beyond what the holder of a mathematical majority of the voting power ordinarily would possess. *See Loral*, 2008 WL 4293781, at \*21 (weighing large stockholder's "blocking power" when making post-trial finding of control).

Importantly, the Stockholders Agreement also contained counter-balancing provisions. As long as stockholders unaffiliated with CD&R held at least 5% of the outstanding voting power, then the Stockholders Agreement required that there be two Unaffiliated Shareholder Directors on the Board. *See* SA § 3.1(c)(i). The Stockholders Agreement granted the Unaffiliated Shareholder Directors the power to nominate their successors, required CD&R to vote for them, and prevented CD&R from acting to remove them unless holders of 80% of the unaffiliated shares wanted them removed. *See id.* § 3.1(c)(v). Once CD&R's ownership fell below 50%, the Stockholders Agreement obligated CD&R to cause its shares to be present at stockholder meetings and vote them in favor of the Board's nominees. *Id.* § 3.2. CD&R also was obligated to vote its shares as recommended by the Board on all proposals relating to compensation or incentives for directors, officers, or employees of the Company, unless the vote involved an issue where CD&R had a contractual consent right. *See id.*

CD&R's contractual obligations to keep the Unaffiliated Shareholder Directors on the Board and, once CD&R's ownership stake CD&R's ownership fell below 50%, its obligation to support the candidates nominated by the Board limited CD&R's ability to

44

retaliate against non-Investor Directors by voting against their re-election or measures that would affect their compensation. These restrictions mitigated the threat of the most blatant form of controller influence, namely a controller's ability to take retributive action against outside directors if they do not support the controller's preferred course of action.[24]

These restrictions do not foreclose a pleading-stage inference of control given the multiple sources of influence at issue in the case. First, CD&R did not give up its ability to vote its shares on issues other than the re-election of directors or matters relating to director, officer, and employee compensation. As to all other issues, CD&R could vote as it wished. CD&R could also vote as it wished on compensation issues if the matter implicated one of CD&R's contractual consent rights.

Second CD&R did not give up its contractual rights. Through these rights, CD&R enjoyed more stockholder-level authority than a controller that held a majority of the outstanding voting power would possess.

Third, under Delaware Supreme Court precedent, the protection given to the non-Investor Directors does not materially change the calculus. The Delaware Supreme Court has made clear that controlling stockholder status does not, standing alone, give rise to pleading-stage concern about the independence or disinterestedness of outside directors.

---

[24] *See, e.g.*, *Tremont*, 694 A.2d at 428 (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk . . . that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder"); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 617–19 (Del. Ch. 2005) (describing case law); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (same).

*See Cornerstone*, 115 A.3d at 1183. In other words, the fact that a controller has sufficient voting power to remove a director or effectively block the director's re-election is not sufficient by itself to call into question the outside directors' independence. The court does not assume that the controller would take punitive action against an outside director that acted contrary to the controller's wishes or interests, just as the court similarly does not assume that the outside directors harbor concern about potentially losing their directorships to a degree that would influence their decision making. *See Aronson v. Lewis*, 473 A.2d 805, 815–16 (Del. 1984) (subsequent history omitted).

Given these legal principles, the voting restrictions in the Stockholders Agreement do not neutralize an otherwise operative assumption that the controller would engage in retribution. They instead are consistent with the baseline expectation that the controller will not engage in retribution. The plaintiff does not allege that CD&R actually made retributive threats against the directors, which could make the voting restrictions more relevant. The plaintiff instead asserts that CD&R exercised Board-level influence through its relationships with directors and by rewarding them.

The voting rights and restrictions in the Stockholders Agreement thus do not undermine the other factors that support a pleading-stage inference of control. It remains reasonably conceivable at the pleading stage that CD&R controlled the Company through a combination of levers.

### d. Other Sources Of Board-Level Influence

Another source of influence that can lead to an inference of actual control is the roles that an alleged controller or its representatives play in the boardroom. In this case,

46

CD&R possessed additional sources of Board-level influence that contribute to a reasonable inference that CD&R exercised actual control over the Company.

In addition to the contractual right to proportionate representation on the Board, the Stockholders Agreement gave CD&R the right to proportionate representation on each committee of the Board, except when service by a CD&R appointee would result in a conflict. SA § 3.1(d)(i). Through this right, CD&R was assured of proportionate representation on key committees, such as the Executive Committee and the Nominating and Corporate Governance Committee (the "Nominating Committee"). The Stockholders Agreement notably gave CD&R the right to select the Chairman of the Executive Committee or the Board's "Lead Director." *Id.* § 3.1(b)(v). CD&R had the power to exercise these rights as long as it held a voting interest of 20% of more. *Id.*

Here again, the Stockholders Agreement contained counter-balancing provisions. As long as stockholders unaffiliated with CD&R held at least 5% of the outstanding voting power, the Stockholders Agreement required that there be at least two Unaffiliated Shareholder Directors on the Board and that every committee contain at least one Unaffiliated Shareholder Director. *See id.* §§ 3.1(c)(i) & 3.1(d). The requirement to have an Unaffiliated Shareholder Director on each committee mitigated somewhat CD&R's right to proportionate representation on committees.

On balance, CD&R's right to proportionate representation combined with its connections with Kremer and Affeldt support a pleading-stage inference of significant influence. For example, through its right to proportionate representation on committees, CD&R had the power to designate two of the six members of the Nominating Committee,

47

and it filled those seats with Berges and VanArsdale. In addition to the CD&R executives. Kremer served on the Nominating Committee, and Kremer had a longstanding relationship with CD&R. Berges served as Chair of the Nominating Committee.

"As the nominating process circumscribes the range of choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders." *Harrah's Entm't, Inc. v. JCC Hldg. Co.*, 802 A.2d 294, 311 (Del. Ch. 2002) (internal quotation marks omitted) (quoting *Durkin v. Nat'l Bank of Olyphant*, 772 F.2d 55, 59 (3d Cir. 1985)). As Boss Tweed famously said, "I don't care who does the electing, so long as I get to do the nominating." Lawrence A. Hamermesh, *Director Nominations*, 39 Del. J. Corp. L. 117, 117 (2014) (internal quotation marks omitted). The composition of the Nominating Committee meant that CD&R could determine its agenda and count on three of six votes. It is therefore reasonable to infer that that the Nominating Committee would not nominate anyone whom CD&R opposed and would support anyone that CD&R supported. It is reasonable to infer that CD&R's influence over the Nominating Committee gave CD&R significant influence over the composition of the Board.

CD&R's Board-level rights contribute to a reasonable inference that CD&R exercised actual control over the Company. This decision does not consider whether these rights, standing alone, would support a reasonable inference of control. In conjunction with other indicators of control, however, they support the necessary pleading-stage inference.

### e. Relationships With Key Executives And Advisors

Another source of influence that can lead to an inference of actual control is the existence of relationships between the alleged controller and the key managers or advisors

48

who play a critical role in providing directors with alternatives, providing information about the available options, and making recommendations as to what course to follow.[25] In this case, the plead relationships are relatively weak, but they add to the overall picture.

This decision has already discussed CD&R's relationship with Riley. He and Metcalf proposed pursuing the Challenged Transaction, and Riley and his management team gave presentations that advocated for the deal. In the abstract, of course, there is nothing wrong with that. Indeed, management presentations about a deal are invariably part of the process, and it would be surprising not to have them. But for purposes of evaluating whether CD&R had the ability to exercise influence and control over the deal process, CD&R's relationship with Riley is a factor.

CD&R also had an existing relationship with Evercore, the Committee's banker. The Committee did not interview bankers and select its own. Instead, the Company's CFO contacted Evercore and vetted the individuals who would lead the engagement. The Company's CFO represented that Evercore had no conflicts of interest vis-à-vis CD&R or New Ply Gem, but at the time, Evercore was working as a restructuring advisor for another CD&R portfolio company. The Committee also did not interview and hire its own law firm, opting to hire the Company's existing counsel.

---

[25] *See OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 706–07 (Del. Ch. 2014) (considering defendant's relationship with management, including tips received by defendant from company's officers that provided negotiating leverage, as supporting reasonable inference of control); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (discussing interactions between board chairman and banker).

49

CD&R's relationships with management and the Company's advisors contribute to a reasonable inference that CD&R exercised actual control at the time of the Challenged Transaction. Standing alone, these relationships would not support a reasonable inference of control. In conjunction with other indicators of control, however, they support the necessary pleading-stage inference.

### f. The Pleading-Stage Conclusion

Based on the foregoing factors, considered in the aggregate, the Complaint alleges facts sufficient to support a reasonable inference that CD&R controlled the Company. Whether a constellation of facts supports an inference of control is a fact-specific inquiry, and different constellations of facts can lead to different outcomes. *See, e.g., In re Rouse Props., Inc., Fiduciary Litig.*, 2018 WL 1226015, at *11–20 (Del. Ch. Mar. 9, 2018); *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *16–20 (Del. Ch. May 31, 2017). This also is a pleading-stage inference, where the plaintiff receives the benefit of the doubt in a close case. The evidence at a later stage may prove that the inference is unwarranted. *See Dole*, 2015 WL 5052214, at *16 ("Before trial, Conrad's role as Chair was not a reassuring fact. . . . But after hearing Conrad testify and interacting with him in person at trial, I am convinced that he was independent in fact.").

## B. Count I: Breach Of Fiduciary Duty Against CD&R

Count I asserts a claim for breach of fiduciary duty against CD&R in it capacity as the Company's controlling stockholder. Because CD&R also controlled New Ply Gem, it stood on both sides of the Challenged Transaction and must establish that the Challenged Transaction was entirely fair. *See Ams. Mining*, 51 A.3d at 1239. To survive a pleading-

stage motion to dismiss, a plaintiff must plead facts from which it is reasonably conceivable that the Challenged Transaction was not entirely fair.

When entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*

At the pleading stage, the Complaint's allegations call into question the Challenged Transaction for purposes of the fair price aspect of the entire fairness test. A large valuation gap exists between the agreed-upon equity value of New Ply Gem that CD&R and Golden Gate established for purposes of the Precedent Transaction and the value implied by the

51

equity split that CD&R obtained in the Challenged Transaction. That gap is sufficient to support a pleading-stage inference of financial unfairness.

At the pleading stage, the Complaint's allegations also call into question the Challenged Transaction for purposes of the fair process aspect of the entire fairness test. The Committee opted to rely on Evercore, even though it is reasonable to infer for pleading purposes that management selected the bank and picked the personnel who would work on the deal. Management represented that Evercore did not have any conflicts of interest, yet Evercore was advising another CD&R portfolio company while working for the Committee. Evercore initially analyzed the combination using the agreed-upon equity value from the Precedent Transaction as the equity value for New Ply Gem, which supported a post-transaction ownership structure in which the Company's former stockholders would own two-thirds of the equity. After meeting with CD&R, however, Evercore revised its valuation methodologies and provided analyses that justified a less favorable split. The defendants have offered reasons why Evercore's actions were reasonable and proper, but the court cannot make the necessary determinations on a motion to dismiss.

The plaintiffs have also pointed to disclosure issues. In *Weinberger*, the Delaware Supreme Court held that the entire fairness standard requires compliance with the duty of disclosure and incorporated this principle into the fair dealing aspect of the test. *See id.* at

52

710.[26] On the facts of the case, the *Weinberger* court held that "[m]aterial information, necessary to acquaint [the minority] shareholders with the bargaining positions of [the majority stockholder], was withheld under circumstances amounting to a breach of fiduciary duty." 457 A.2d at 703. The Delaware Supreme Court "therefore conclude[d] that this merger does not meet the test of fairness." *Id.* at 703; *accord Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation.").

The Proxy Statement failed to disclose adequately that when CD&R purchased New Ply Gem only months previously, CD&R and Golden Gate valued New Ply Gem's equity at $638 million. This information was material because it directly addressed the fairness of the Challenged Transaction. *See, e.g.*, *Gilmartin v. Adobe Res. Corp.*, 1992 WL 71510, at *10 (Del. Ch. Apr. 6, 1992) ("It is axiomatic that [disclosure concerning the] fairness of the consideration offered in a merger . . . is material . . . ."). This information should have appeared "in plain English" in the section on the "Background of the Merger" and the

---

[26] The *Weinberger* decision referred to the duty of disclosure as the "duty of candor." *Id.* at 711. The Delaware Supreme Court coined this phrase in *Lynch v. Vickers Energy Corp.* (*Vickers I*), 383 A.2d 278, 279, 281 (Del. 1977). Delaware decisions used it consistently until *Stroud v. Grace*, 606 A.2d 75 (Del. 1992), when the Delaware Supreme Court criticized the term as potentially misleading. The *Stroud* court clarified that the duty of candor "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Id.* at 84. After *Stroud*, the prevailing Delaware terminology shifted from the "duty of candor" to the "duty of disclosure."

discussion of the Challenged Transaction's financial fairness. *See Vento v. Curry*, 2017 WL 1076725, at *3 (Del. Ch. Mar. 22, 2017).

The defendants point out that the inputs for calculating the $638 million valuation appear in the Proxy Statement, but they are buried in note 7 to the allocation of the purchase price, where the Proxy Statement refers on page 120 to "equity contribution of $425.2 million by Sponsor Fund X Investor" and on page 121 to "$212.8 million of non-cash consideration in the form of an equity rollover by Golden Gate Capital." Ex. 1 at 120–21. When summed, these figures produce the equity valuation of $638 million. The Proxy Statement also discloses the precise figure of $637,911,000, without context, on page 111 as "Additional Paid-In Capital" on the Company's pro forma balance sheet. *Id.* at 111.

Delaware law requires that plainly material information be disclosed in a "clear and transparent manner." *Vento*, 2017 WL 1076725, at *4. "A stockholder should not have to go on a scavenger hunt," then "piece together the answer from information buried" in a lengthy proxy statement. *Id.* at *3–4. At the pleading stage, under the "buried facts" doctrine, it is reasonable to infer that the agreed-upon valuation for New Ply Gem was not adequately disclosed.

It is thus reasonably conceivable that the Challenged Transaction was not entirely fair because of shortcomings in both price and process. Count I therefore states a claim on which relief can be granted.

## C.    Count II: Breach Of Fiduciary Duty Against The Director Defendants

Count II asserts a claim for breach of fiduciary duty against the director defendants for approving the Challenged Transaction. Absent additional pleading-stage obstacles, this

54

count would state a claim against the director defendants for the same reasons that it states a claim against CD&R. But the director defendants invoke two doctrines that CD&R does not have available: exculpation and abstention.

### 1. Exculpation

Affeldt, Kremer, Ball, Forbes, Holland, Martinez, and Riley argue that any claim against them should be dismissed because the Company's certificate of incorporation contains a provision that exculpates directors to the fullest extent permitted by Delaware law. Section 102(b)(7) of the Delaware General Corporation Law authorizes the certificate of incorporation to contain a provision

> eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). An exculpatory provision shields the directors from personal liability for monetary damages for a breach of fiduciary duty, except liability for the four identified categories. "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler *et al.*, *Delaware Corporation Law and Practice*, § 6.02[7], at 6-18 (2013 & Supp. Dec. 2019). An exculpatory provision therefore "will not place challenged conduct beyond judicial review." *Id.* at 6-19.

When a corporation's charter contains an exculpatory provision,

> [a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon*, *Unocal*, the entire fairness standard or the business judgment rule.

*Cornerstone*, 115 A.3d at 1175–76 (footnotes omitted). To state a claim against each individual director, the Complaint must "plead[] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interest, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179–80. "[E]ach director has a right to be considered individually," and "the mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent." *Id.* at 1182–83.

"[T]o plead a claim that [the defendant] did not act in good faith, [the plaintiff] must plead facts supporting an inference that [the defendant] did not reasonably believe that the . . . transaction was in the best interests of the [Company]." *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 260 (Del. 2017). An all-too-human trial judge lacks the ability to read a defendant's mind and discern the defendant's true intentions. As the Delaware Supreme Court trenchantly observed, "the members of the Court of Chancery cannot peer into the hearts and souls of directors." *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013) (footnote and internal quotation marks omitted). Even after discovery and a trial, a judge may need to make a credibility determination about a defendant's state of mind, drawing on a combination of direct evidence, indirect evidence, and circumstantial

evidence. *See id.*; *cf. State v. Anderson*, 74 A. 1097, 1099 (Del. 1910) (recognizing that intent "may be found by direct evidence, such as the admissions or declarations of the accused, or by indirect evidence; that is by the rational inferences to be drawn from what the accused is proven to have done or said, and from all the facts and circumstances involved in the transaction").

At the pleading stage, the trial court must draw reasonably conceivable inferences in favor of the plaintiff based on what the allegations of the complaint suggest, recognizing that "it may be virtually impossible for a . . . plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleadings stage." *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993). Because "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable," a defendant's state of mind and knowledge may be averred generally. *Id.* A court can therefore consider "relevant circumstantial facts that bear on scienter, which include the substance and effects of the defendants' conduct." *Prod. Res. Gp. L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 800 n.85 (Del. Ch. 2004). The facts alleged need only support a litigable inference of disloyalty or bad faith. *See Gelfman v. Weeden Inv'rs, L.P.*, 792 A.2d 997, 989–90 (Del. Ch. 2001). The inference need not be the only possible inference, nor even the most likely inference. The inference need only be reasonably conceivable.

The plaintiff alleges that the directors approved purchasing a company from a controlling stockholder at a 94% premium to the arms'-length price from three months earlier. They allege that the resulting valuation gap is sufficiently large, and the temporal

gap sufficiently short, to support a litigable inference that the directors may have acted to benefit the controller, rather than the Company and its stockholders.[27]

The defendants contend that the valuation gap was justified by synergies, both those created in the creation of New Ply Gem and those that would be generated through the Challenged Transaction. Disagreeing with the Complaint's allegation that New Ply Gem's high levels of debt were a problem for CD&R and Golden Gate, the defendants maintain that the debt's terms were so loose as to provide an advantageous capital structure for the combined entity. The defendants also cite amendments to the Stockholders Agreement, which they say conferred value on the Company. They even point to a decline in the Company's stock price after the Challenged Transaction was announced, which in turn reduced the value of the shares that the Company issued as consideration. Assessing these justifications would require factual assessments that the court cannot make at the pleading stage. Crediting the defendants' arguments would require drawing inferences in favor of the defendants, rather than the plaintiff.

---

[27] *See Morris v. Spectra Energy P'rs (DE) GP, LP*, 2017 WL 2774559, at *14 (Del. Ch. June 27, 2017) (explaining that "[q]uibbles with a valuation methodology, alone, are not sufficient" for "pleading subjective bad faith," but "when the well pled allegations . . . show that an asset's market value is $1.5 billion, specific allegations demonstrate that the [controller] knew of that implied value, and the Complaint alleges that the asset was surrendered for less than $1 billion in consideration, subjective bad faith can be inferred at the pleading stage"); *see also Encore Energy*, 72 A.3d at 107 ("It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the [company] and the directors knew of those facts.").

The Complaint does not identify any compromising relationships or sources of influence between CD&R and Martinez, Ball, Forbes, and Holland. Other than their decision to approve the Challenged Transaction on terms that the Complaint depicts as overly generous to CD&R, there is not any plead basis to infer that these defendants acted disloyally or in bad faith. Given the pled facts, it is not reasonably conceivable that they could be held liable. These defendants are entitled to dismissal under Section 102(b)(7).

Kremer and Affeldt have longstanding ties to CD&R. The combination of their connection to CD&R and the large valuation gap supports a pleading-stage inference that they potentially acted to serve CD&R's interest. This is only a pleading-stage inference. Other inferences are possible, but at the pleading stage, the plaintiff receives the benefit of any reasonable inferences that favor the plaintiffs' claim.

Riley cannot obtain dismissal because he may have acted out of loyalty to CD&R and because it is possible that he could have breached his duties in his capacity as an officer. Section 102(b)(7) does not authorize exculpation for officers. *See Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers."). The Complaint contains allegations that could support potential misconduct by Riley in his capacity as an officer, such as when providing his assessment of the Challenged Transaction to the Board and advocating in favor of the deal. It is therefore reasonably conceivable that Riley acted in his capacity as CEO and cannot rely on the protection of Section 102(b)(7).

59

## 2. Abstention

Sleeper, Berges, Zrebiec, and VanArsdale argue that they cannot be liable because they recused themselves from participating as directors in the discussion of the Challenged Transaction. They also abstained from voting on the deal. Although this defense may ultimately prevail, it would be premature to rule on it at the pleading stage.

"A director can avoid liability for an interested transaction by totally abstaining from any participation in the transaction."[28] "Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful." *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at \*2 (Del. Ch. Mar. 9, 1995). But this is "not an invariable rule."[29]

---

[28] *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at \*15 (Del. Ch. Mar. 15, 2019); *see Weinberger*, 457 A.2d at 710–11 ("[I]ndividuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and in the absence of . . . the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies." (emphasis added)); *see also Propp v. Sadacca*, 175 A.2d 33, 39 (Del. Ch. 1961) (concluding that a conflicted director was not legally responsible for unfair aspects of the transaction where he "abstained from voting in good faith because he honestly believed that if he were to become involved in consideration of [the transactions], his duties as a director would somehow come in conflict with his own self-interest" because it was not "the type of corporate act for which a director may clearly be held liable . . . "), *aff'd in part and rev'd in part on other grounds sub nom. Bennett v. Propp*, 187 A.2d 405 (Del. 1962).

[29] *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007); *see Tri-Star Pictures,* 1995 WL 106520, at \*3 ("[N]o *per se* rule unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on the challenged transaction."); *Dairy Mart*, 1999 WL 350473, at \*1 n.2 (explaining that "mere abstinence

60

One might, for example, imagine a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. As part of the conspiracy, those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability. In such circumstances it is highly unlikely that those directors' "nonvote" would be accorded exculpatory significance.

*Tri-Star Pictures*, 1995 WL 106520, at *3. "Similarly, an absent director . . . who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors." *Valeant*, 921 A.2d at 753–54; *see also Oracle*, 2018 WL 1381331, at *21. Or a court might hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director was "closely involved with the challenged [transaction] from the very beginning" and the transaction was rendered unfair "based, in large part," on the director's involvement. *Gesoff*, 902 A.2d at 1166 n.202. More generally, this court may hold an absent director liable if the director "play[ed] a role in the negotiation, structuring, or

---

from a vote does not, in the ordinary course, shield or absolve directors from liability" because "[i]t would hardly seem appropriate for directors, by their own choosing, to decide to abdicate [their affirmative fiduciary] duties by not forming an opinion about a board decision"); 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations*, § 4.16[A], at 4-150 (3d ed. 1998 & Supp. 2019) ("Typically, directors who did not attend or participate in the board's deliberations on, or approval of, a transaction will not be held liable for that transaction. But an absent director 'who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors.'" (footnote omitted) (quoting *Valeant*, 921 A.2d at 753–54)).

61

approval of the proposal."[30] "Given the factual nuances underlying this rule, it is no surprise that the leading cases have not addressed the issue at the pleadings stage, but rather in post-trial rulings or on a motion for summary judgment."[31]

Sleeper, Berges, Zrebiec, and VanArsdale recused themselves from the Board's final vote on the Challenged Transaction, but that cookie-cutter step is not sufficient to establish a successful abstention defense. The CD&R representatives did not absent themselves from the process entirely. In April 2018, Riley and Metcalf discussed a potential merger with a CD&R team that included Sleeper, Berges, and Zrebiec. On May 1, Sleeper, Berges, Zrebiec, and VanArsdale participated in the discussions that led to the Board reaching a consensus that a merger with New Ply Gem was the Company's most promising business opportunity. After the Board established the Committee, Sleeper and Zrebiec met with Evercore, and Sleeper presented the Board with CD&R's views on the valuation and argued for an equity split that favored CD&R.

---

[30] *Valeant*, 921 A.2d at 753; *see In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *12 (Del. Ch. Jul. 17, 2018); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *38 (Del. Ch. Apr. 14, 2017, revised Apr. 24, 2017); *see also Cambridge Ret. Sys. v. DeCarlo,* C.A. No. 10879-CB, at 44–48 (Del. Ch. June 16, 2016) (TRANSCRIPT) (explaining that plaintiffs alleged sufficient participation by a conflicted director where complaint stated the director attended a meeting where the board of directors failed to fully consider a decision and another meeting where the special committee approved an apparently "prebaked" deal).

[31] *Pilgrim's Pride*, 2019 WL 1224556, at *17; *see Weinberger*, 457 A.2d at 710–11 (post-trial); *Emerald P'rs v. Berlin*, 2001 WL 115340, at *19–20 (Del. Ch. Feb. 7, 2001) (post-trial), *rev'd on other grounds*, 787 A.2d 85 (Del. 2001); *Tri-Star*, 1995 WL 106520, at *1 (summary judgment); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 492 (Del. Ch. 1990) (post-trial).

Sleeper, Berges, Zrebiec, and VanArsdale contend that their participation as representatives of CD&R should not count for purposes of the abstention analysis. It is not clear at this stage precisely when the CD&R directors were participating solely as representatives of CD&R. For some of the interactions, the answer seems straightforward, but making the capacity determination that the CD&R directors request would require drawing inferences in favor of the defendants, rather than the plaintiff.

The analysis is also complicated because of the pleading-stage inference that CD&R controlled the Company. Once in that framework, CD&R would need to have implemented both of *MFW*'s protective mechanisms to obtain a pleading-stage determination that it did not stand on both sides of the transaction and influence its terms. In this case, CD&R did not follow *MFW*. As a result, it is reasonably inferable that CD&R owed duties to the Company and its stockholders throughout the transaction process and that entire fairness provides the operative standard of review. As dual fiduciaries for both the Company and CD&R, the CD&R directors likewise continued to owe duties to the Company and its stockholders throughout the transaction process. Given this legal framework, it seems unlikely that the CD&R directors could have participated in the process on behalf of CD&R and yet obtain pleading-stage dismissal under an abstention theory. Whether the CD&R directors complied with their fiduciary duties instead requires fact-specific analyses that cannot be conducted on a motion to dismiss.

## D.    Count III: Unjust Enrichment

Count III of the Complaint asserts that the Challenged Transaction resulted in CD&R being unjustly enriched. The elements of unjust enrichment are: (1) an enrichment,

63

(2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

The unjust enrichment claim is predominantly a fallback claim. If the plaintiff were able to prove that one or more of the directors breached their fiduciary duties under Count II, but somehow were not able to prove that CD&R breached its fiduciary duties under Count I, then CD&R could have been unjustly enriched to the extent it received benefits from the Challenged Transaction that flowed from a breach of duty. If so, then the Company would have suffered an impoverishment that corresponded to CD&R's enrichment. Because of the breach of duty by the directors, the enrichment would not be justified, but because of the lack of a viable claim for breach of fiduciary duty against CD&R, there would not be an adequate remedy at law. Under those circumstances, it is possible that the unjust enrichment claim could provide a viable means of relief. *See Hsu Living Tr.*, 2017 WL 1437308, at *43.

It seems unlikely that this set of circumstances would come to pass. If CD&R is not found to be a controller, then the business judgment rule is likely to protect the Challenged Transaction, removing the predicate breach of duty necessary for the enrichment to be unjust. The only doctrinal path that seems viable for the plaintiff is to establish that CD&R controlled the Company, in which case the claim for unjust enrichment becomes redundant and superfluous.

Although Count III is likely duplicative of Count I, "Delaware law does not appear to bar bringing both claims." *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del.

Ch. Oct. 28, 2011). While there ultimately will be only one recovery, at the pleading stage it is possible that "factual circumstances [might exist] in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical." *MCG Capital*, 2010 WL 1782271, at *25 n.147; *accord Tornetta*, 2019 WL 4566943, at *15. The motion to dismiss Count III is therefore denied.

## III.    CONCLUSION

The motions to dismiss Counts I and Count III are denied. The motion to dismiss Count II is granted as to defendants Martinez, Ball, Forbes, and Holland. Otherwise, the motion to dismiss Count II is denied.